UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Charles McLendon, | ) | C/A No.: 4:13-3403-BHH-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Horry County Police Department; Scott | ) | |
| Rutherford, Johnny Harrelson, Kristin | ) | |
| Dawn Harmon, Saundra Rhodes, | ) | |
| Christopher John Arakas, Phillip | ) | |
| Thompson, and Horry County Sheriff's | ) | |
| Department, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Charles McLendon ("Plaintiff" or "McLendon") filed what might be described

as a "hybrid" 42 U.S.C. § 1983/employment suit in the Court of Common Pleas of Horry

County, South Carolina against his former employer, Horry County Police Department

("HCPD"); his former coworkers, Scott Rutherford ("Rutherford") and Johnny Harrelson

("Harrelson"); his former wife, Kristin Dawn Harmon ("Harmon");[1] his former supervisor,

HCPD Chief Saundra Rhodes ("Rhodes"); Horry County Magistrate Christopher John Arakas

("Arakas"); Horry County Sheriff Phillip Thompson ("Thompson"); and the Horry County

Sheriff's Department ("HCSD"). The matter was removed to this court. ECF No. 1. The parties

completed discovery, and the court now considers the Motion for Summary Judgment brought by

all Defendants *except* Harmon (for convenience, the court refers to the movants collectively as

"Defendants"). ECF No. 77. Having considered Plaintiff's response in opposition, ECF No. 88;

---

[1] Kristin Dawn Harmon ("Harmon") was sued as "Kristin Dawn McLendon" in the original
Complaint. ECF No. 1-1. The only amendment to the original Complaint is to change this
Defendant's name to "Harmon" in the Amended Complaint. ECF No. 43. Harmon is not a party
to the Motion under consideration.

the Defendants' reply, ECF No. 96; the pleadings and applicable law, the undersigned submits

this Report and Recommendation ("Report") recommending the Moving Defendants' Motion,

ECF No. 77, be *granted in part and denied in part*.[2]

I.     Plaintiff's Causes of Action

Plaintiff's Amended Complaint includes claims related to his previous employment as an

officer with HCPD, his December 2012 arrest for criminal domestic violence ("CDV") and

misconduct in office, and his May 2013 arrest for violation of a court order. He brings the

following causes of action:

- A 42 U.S.C. § 1983 claim against all moving Defendants (HCPD, Rhodes, Harrelson, Rutherford, Arakas, HCSD, and Thompson). Am. Compl. ¶¶ 84-92.

  - This cause of action includes allegations of false arrest, malicious prosecution that would "destr[oy] the Plaintiff's reputation so that the Plaintiff would be constructively discharged[,]" *id.* ¶ 89, false arrest, and violation of Plaintiff's constitutional rights.

- A state-law-based claim for intentional interference with a contract against Harrelson and Rutherford. *Id.* ¶¶ 93-101.

  - Plaintiff avers his former coworkers Harrelson and Rutherford interfered with his "contract of employment" with HCPD and made false statements regarding Plaintiff's integrity to procure Plaintiff's "constructive discharge" from his employment[3] and to ruin his "reputation as a police officer in the community." *Id.* ¶ 96.

- A state-law-based claim for wrongful termination in violation of public policy against HCPD. *Id.* ¶¶ 102-09.

---

[2]All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g), D.S.C, which provides that "[a]ll pretrial proceedings involving litigation arising out of employment discrimination cases invoking federal statutes which proscribe unfair discrimination in employment" be referred to a United States Magistrate Judge. Because the Motion for Summary Judgment is dispositive, the undersigned enters this Report for the district judge's consideration.

[3] Although Plaintiff's Amended Complaint references his separation from employment with HCPD as "constructive discharge," Plaintiff's factual statement in response to the pending Motion indicates he was terminated by Defendant Rhodes. *See* Pl.'s Mem. 10, ECF No. 88; Rhodes Dep. 16, ECF No. 88-22.

- o Plaintiff submits HCPD constructively discharged him in retaliation for his having "reported illegal actions on the part of individuals employed" with HCPD." *Id.* ¶ 105.

- A state-law-based claim for abuse of process against Rutherford. *Id.* ¶¶ 110-16.

  - o Plaintiff asserts Rutherford "had ulterior motives in instructing the officers to charge the Plaintiff with criminal charges." *Id.* ¶ 112.

- A state-law-based claim for intentional infliction of emotional distress against all Defendants. *Id.* ¶¶ 117-122.

- A state-law-based claim for conversion against one unspecified Defendant, presumably HCPD. *Id.* ¶¶ 123-28.

  - o This claim relates to personal property he installed on "one of the Defendant's motorcycle[s]." *Id.* ¶ 124.

- A state-law-based claim for slander against Harmon. *Id.* ¶¶ 129-37.

- A state-law-based claim for assault against Harmon. *Id.* ¶¶ 138-47.

- A 42 U.S.C. § 1981 claim of retaliation against HCPD and Rutherford. *Id.* ¶¶ 148-54.

  - o Plaintiff avers he suffered an "adverse employment action" because he had engaged in protected activity and Rutherford's actions toward him "were in direct retaliation for his reports against the precinct." *Id.* ¶¶ 152-53.

## II.    Standard of Review[4]

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth

---

[4] Defendants move for summary judgment pursuant to Rule 56, submitting there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. ECF No. 77. Interestingly, neither the Motion nor Memorandum in support sets out the relevant standard. That, in and of itself is not troubling. However, Defendants' "Statement of the Facts" in support of their Motion is overly argumentative and takes many of the facts from the deposition of Defendant Harmon, Plaintiff's now-ex-wife with whom he had an altercation without noting record facts—particularly from Plaintiff—that dispute the version of events Defendants present.

specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact).  In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The

court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

III.    Facts

The following summary focuses on facts potentially pertinent to issues raised in Defendants' Motion. These facts are set forth in the light most favorable to Plaintiff, to the extent such facts are supported in the record. The court notes that, in addition to including his own factual summary of those events discussed in Defendants' Motion, Plaintiff provides significant background detail concerning his April 1999-to-December 2012 employment with HCPD, including specifics regarding a January 2012 officer-involved shooting and his June 2012 reporting to Defendant Rhodes about "illegal activities with in (sic) the Southern Division [of HCPD]." Am. Compl. ¶ 40; *see* Pl.'s Resp. 9 (quoting his own deposition and indicating that during his employment with HCPD, he "made several complaints regarding his direct supervisor Jack Stewart," many of which concerned "Mr. Stewart['s] racist remarks").

Although Defendants' Motion includes no facts regarding Plaintiff's pre-2012 HCPD employment, Plaintiff's response includes many detailed facts regarding his training as a law enforcement officer and his employment history with HCPD (including various HCPD employment-related policies). *See* Pl.'s Mem. 2-7 and referenced exhibits. In reply, Defendants

do not dispute Plaintiff's facts concerning his pre-2012 employment or the included policies. Defs.' Reply, ECF No. 96. The court notes Plaintiff's employment history includes generally positive performance reviews from HCPD, *e.g.*, ECF Nos. 88-6, 88-8, 88-9, 88-10, 88-12), and that he received several promotions, *e.g.*, ECF No. 88-11 (Jan. 16, 2010 promotion to corporal). Detailed recitation of Plaintiff's pre-2012 employment history is not included in this factual summary as it is not necessary in analyzing Defendants' Motion. For the sake of completeness, the following factual summary includes some of the 2012 detail offered by Plaintiff, although the undersigned notes that much of it seems to be immaterial to the issues presented in Defendants' Motion.

### a. January 2012 Officer-Involved Shooting

Plaintiff's factual summary includes detail concerning a January 28, 2012 shooting incident. Plaintiff indicates he was "involved" in an officer-involved shooting, citing principally to his affidavit, ECF No. 88-5, and his deposition, ECF No. 77-3 at 32-33. *See also* ECF No. 88-14 at 34-41 (statements concerning the January 28, 2012 event).

Plaintiff indicates he was the first supervisor at the home of a suicidal individual, and that two officers he supervised—Dishong and Buckingham—were also there. Plaintiff had been in the room where the individual was hiding in a closet, and Plaintiff had stepped out when he heard a gunshot and heard an officer call out. Although no officer was hurt, Plaintiff stated he started to feel guilty that he had not been inside the room when the shots were fired. Pl.'s Dep. 33-34. Although Plaintiff includes details regarding this incident and its aftermath, as well as the HCPD Post-shooting Policy, in the factual section of his responsive memorandum, none of these facts is discussed further as supporting any of the causes of action that are the subject of Defendants' Motion. *See* Pl.'s Resp. 4-5, 8.

**b. Plaintiff's 2012 Counseling/Information about marital issues**

Plaintiff indicates he and his now-ex-wife Harmon separated on April 15, 2012, and that when he reported to work on "the first day of motorcycle week," he advised both Rutherford and Harrelson about the separation and that he had learned his wife had been having an affair. Pl.'s Dep. 22-23, ECF No. 77-3 (full transcript of Pl.'s Dep.). Plaintiff notes that he spoke to Rutherford behind closed doors that same day and was "almost in tears" when discussing the marital separation. *Id.* at 22. Plaintiff notes Rutherford asked whether Plaintiff needed to go home, and Plaintiff indicated he wanted to "stay at work," but asked that Rutherford not "expect a whole lot" out of him. *Id.* at 23. At deposition, Plaintiff indicated he wanted to receive counseling for issues related both to work and to his marriage, although he never discussed work-related issues when meeting with his marriage counselor. *Id.* at 24-27. In his affidavit, Plaintiff indicated he had been "hoping" Harrelson would have asked whether he [Plaintiff] needed to talk to someone, but he did not. Pl.'s Aff. 7, ECF No. 88-5. The court again notes that Plaintiff does not focus on these points in responding to issues raised by Defendants in the instant Motion.

**c. Plaintiff's 2012 Reporting of "Racist Comments"**

Plaintiff indicates that, during his employment with HCPD, he "made several complaints regarding his direct supervisor Jack Stewart . . . [and that] [m]any of the complaints were regarding Mr. Stewart['s] racist remarks." Pl.'s Mem. 8 (citing Pl.'s Dep. 53-54; Harrelson Dep. 9, ECF No. 88-21 (noting Harrelson did not recall specifics)). Plaintiff recalls telling Sergeant Mueller what happened with a particular prisoner and noting Mueller told Plaintiff that Stewart "picks one person to ride" and that Plaintiff was that person. Pl.'s Dep. 52-53. Plaintiff's

deposition testimony does not reference his reporting of any racist remarks. In Plaintiff's affidavit, he indicates:

> During my employment I reported several racist statements made by supervisors. Racist Comments made by Jack Stewart. Jack called Garry Gause a nigger during a conversation. A few weeks later while mapping out a run from the Socastee High School Jack again made comments about Sgt. Gause calling him ignorant, and a mother f****er, and stating he would run him off. Shortly thereafter, Sgt. Gause was no longer with the Police Department.

Pl.'s Aff. 16. Harrelson noted in deposition that he recalled talking with Plaintiff about Stewart and that Plaintiff did not like Stewart, although Harrelson did not recall why. Harrelson Dep. 9. In Plaintiff's affidavit, he indicates he never reported Stewart's racist comments to Rhodes "for fear of retaliation from Rutherford, Stewart and being labelled a snitch." Pl.'s Aff. 9. Plaintiff states he had mentioned to Mueller that Stewart made racist comments about "a black Sgt. and called him vulgar names and that [he] had a recording of the comments, but never went in to detail[, and] Sgt. Mueller kind of laughed and blew it off." *Id.*

### d. Events of December 2-3, 2012[5]

According to Plaintiff,[6] he was working on December 2, 2012, when at some point[7] he told his supervisor, Sergeant Kent Donald, he "had some issues" and needed to be off duty for the remainder of that night. Pl.'s Dep. 129; *see generally* Pl.'s Aff. 12. As explained by Plaintiff, he had gone to the home he had previously shared with Harmon, his then-estranged wife, Pl.'s Dep. 136, in his police vehicle and "caught her with the other man." Pl.'s Dep. 130. He

---

[5] The relevant events began sometime during the evening of December 2, 2012, and culminated in Plaintiff's arrest in the early hours of December 3, 2012. Accordingly, these dates are sometimes used interchangeably by the parties and the court.

[6] As it must, the court considers the facts regarding the events of December 2-3, 2012 in the light most favorable to Plaintiff but notes Defendants' version of events is different in some respects. *Compare* Defs.' Mem. 5-6 *with* Pl.'s Mem. 9-10. As detailed within, these factual disputes are not material to the undersigned's recommendation herein.

[7] In his deposition, Plaintiff indicated he contacted his supervisor, but he could not recall when during the "unfolding of events" he did so. Pl.'s Dep. 129-30.

acknowledged he had turned the GPS and computer in his police vehicle off. *Id.* at 129, 131. As explained by Harmon, Plaintiff met Kevin in the driveway of the home where only Harmon lived at the time. After returning from a trip to Charleston at around 9:30 or 10:00 p.m. that evening, Harmon was waiting in the car while her friend "Kevin" (referred to by Plaintiff as the "other man") went inside briefly. Harmon Dep. 11, ECF No. 77-2.  At the same time Kevin was walking back outside toward the car, Plaintiff "came flying down the road in his patrol car and like flew into the driveway." *Id*. Harmon got out of the car and introduced Plaintiff and Kevin; Plaintiff refused to shake Kevin's hand. Plaintiff then returned to his patrol car; "flew into reverse"; announced over the cruiser's PA system, "['']Thank you, Kevin, because this is the last night of my life[';] and sped off down the road." *Id.* at 11-12. At that point, Harmon drove Kevin to pick up his vehicle, which had been parked nearby at her parents' house. Harmon testified that, when leaving her parents' house, Plaintiff "came flying up behind" her car in his patrol car and told her to stop. She did not stop, and Plaintiff dropped behind her, turned on the patrol car lights, and instructed her to stop in front of her home. She went around the corner, and he blocked her exit with his patrol car. *Id.*

Plaintiff indicates he "pulled in front of [Harmon]," removed his wedding ring with his right hand, and "pulled his [police-issued] gun only a short way out of the holster to release the magazine[, but his] weapon never came out of the holster." Pl.'s Aff. 13.[8] Plaintiff indicated he then left the area and returned about one hour later. Plaintiff states Harmon was not home when he returned, and he went into the home and dumped drawers and broke a bi-fold door trying to locate jewelry he had given Harmon over the years. *Id.* Plaintiff encountered Harmon returning home when he was leaving. *Id.* Plaintiff indicated his recollection of his actions that evening

---

[8] Harmon's recollection of this incident is similar, although she recalled different timing. *See* Defs.' Mem. 5 (quoting extensively from Harmon's deposition).

were not clear, but notes he and his then-estranged-wife Harmon were "just arguing, when she turned the argument to physical and attacked [him]." Pl.'s Dep. 7. Plaintiff recalls Harmon was "beating on [him], trying to bust [his] head open with a WD-40 can." *Id.* Plaintiff called for help, officers arrived, took him outside, and went inside to talk to Harmon. *Id.*

It is undisputed Officers Jodi Ridgeway and Donald Kent were the first to arrive at the home. Officer Ridgeway provided an arrest report on December 3, 2012, which was verified by Officer Kent. ECF No. 88-15 at 17. In the Arrest Report, which noted the CDV charge against Plaintiff, Ridgeway noted Plaintiff "was agitated and the house showed obvious signs of aggressive behavior." *Id.* Ridgeway recounted what Harmon told her about the events of December 3, 2012, including the encounter prior to Plaintiff's entering the home. *Id.* (including information about the encounter among Plaintiff; Harmon; and Harmon's companion, Kevin). Harmon advised Ridgeway that when she returned to the home and saw Plaintiff, they engaged in "aggressive verbal argument," that Harmon "began hitting [Plaintiff] and at that point [Plaintiff] grabbed her and pinned her down on the floor while placing her in a choke hold." *Id.* The Arrest Report indicated that "[t]hrough the entire situation, and particularly during the time [Plaintiff] approached [Harmon's] vehicle with his weapon drawn (although he never pointed it at her), [Harmon] feared for her safety." *Id.*

Plaintiff was arrested and charged with CDV and misconduct in office. Pl.'s Dep. 8. *See also* ECF No. 77-4 (indicating CDV and misconduct in office offenses took place on December 3, 2012). Plaintiff testified that he was initially charged only with CDV and the misconduct in office charge "came later." Pl.'s Dep. 8. The record includes Officer Ridgeway's December 3, 2012 "Report of Investigation" concerning Plaintiff's charge of Misconduct in Office. ECF No. 88-15 at 16. This Investigation Report focuses on the encounter between Plaintiff and Harmon

when Plaintiff encountered Harmon and her companion, detailing Plaintiff's suggestion of suicide, his use of his patrol car's PA system to speak to Harmon, and his throwing an ammunition magazine from his police-issued gun into Harmon's car. *Id.* Officer Ridgeway also notes Plaintiff was subsequently arrested at the residence he formerly shared with Harmon. She indicated the "deputy precinct commander, precinct commander and Chief of Police were briefed on the incident[,]" and, after "consideration between the police chief and solicitor it was decided to charge [Plaintiff] with Misconduct in Office as he was still on duty and used county issued equipment during this incident." *Id.*

Plaintiff states Harmon assaulted him. Pl.'s Aff. 12.[9] Plaintiff indicates Officer Ridgeway[10] initially advised Plaintiff she would be arresting Harmon, but when Defendant Rutherford arrived on the scene he "became angry and informed the officer [] they would arrest [him] for [CDV]." Pl.'s Aff. 12.[11] Plaintiff also provides a printed message that purports to be a Facebook message exchange[12] between Plaintiff and Ridgeway in which Ridgeway indicated

---

[9] Harmon indicated Plaintiff was "lunging and [she] actually hit him first," defending herself. Harmon Dep. 17. She states that Plaintiff then lifted her and choked her. *Id.* at 17-18.

[10] The record includes no deposition or affidavit from Ridgeway.

[11] Plaintiff acknowledges that Rutherford denies having instructed Ridgeway to arrest Plaintiff for CDV. Pl.'s Mem. 27 (no record citation included). The court's independent review of the record evidence provided by the parties reveals Rutherford stated in deposition it was "the farthest thing from the truth" that he, and not Officer Ridgeway, made the decision to arrest Plaintiff on December 3, 2012. Rutherford Dep. 30-31, ECF No. 88-23. Rutherford also testified that he was present when Plaintiff was arrested on December 3, 2012 because he was aware of an earlier incident that same night. *Id.* at 9. Rutherford had been advised that an earlier incident had taken place at the residence when Plaintiff was on duty but that after the incident Plaintiff could not be found. *Id.* Rutherford went to the residence at the time of the arrest because he "thought it was [his] responsibility to go see if [he] could assist and get a better understanding of what had transpired earlier so [he] could pass it on to [his] boss." *Id.* at 9-10. Further, Rutherford testified that he did not recall having had a conversation with Officer Ridgeway in which Rutherford was advised that Harmon, and not Plaintiff, was the one to make their argument physical. *Id.* at 31.

[12] The printed message includes time stamps, but does not include any indication of the date on which the messages were sent. Because Plaintiff notes the last charge was dismissed "in May," ECF NO. 88-15 at 45, presumably the messages were exchanged sometime after May 2013.

that "[s]he [presumably Harmon] told Sgt. Donald and I (sic) that she was the one that made the argument physical." ECF No. 88-15 at 44, 45. In the same Facebook message, Plaintiff informed Ridgeway that HCPD did not have the video from Ridgeway's car from the night of the December 2012 arrest, to which Ridgeway responded, "Really? They don't have the video? I was made to take my hard drive straight into the station and upload my video's (sic) as soon as I dropped you off." Pl.'s Aff. 45. Plaintiff indicates Ridgeway told him "Rutherford was on tape telling her not to arrest [Harmon] to arrest [Plaintiff]." *Id.* at 12. Rutherford testified that he never watched or listened to audio or video of Plaintiff's December 3, 2012 arrest, but that he had watched the video of "the traffic stop involving [Plaintiff's] wife." Rutherford Dep. 11. Paperwork Plaintiff provided indicates an Horry County judge discharged Plaintiff from custody on a $500.00 bond as to the misconduct in office charge on December 3, 2012. ECF No. 88-15 at 43.

Plaintiff was terminated by HCPD, as set out in Chief Rhodes' Letter of Termination to Plaintiff dated December 3, 2012. ECF No. 88-14 at 5-6. The letter noted a "criminal domestic violence incident" that occurred December 3, 2012 that led to Plaintiff's arrest. *Id.* The letter indicated Plaintiff's "actions were in direct violation of several Horry County Employee Guidelines as well as Horry County Police Department Policies and Procedures." *Id.* The letter continued with the following:

Horry County Employment Guidelines

5.9(13) Conduct on or off duty that has a negative impact on the County.

Horry County Police Department Policy and Procedures
Rules of Conduct Policy Number 1-4

C. Disciplinary/personnel actions
   2. As appropriate, disciplinary action may be taken for any of the following reasons:

    c. Mental or physical unfitness for the position which the employee holds

D. General Conduct
    Employee shall not at any time use or attempt to use their official position, badge, or credentials for personal or financial gain or advantage.

G. Duty
    3. While on duty, officers shall not engage in any activity or personal business which would cause them to neglect their duty.

ECF No. 88-14 at 5-6. The letter indicated officers "found probable cause" for Plaintiff's arrest upon responding to a 911 call involving a Criminal Domestic Violation allegation." *Id.* at 6. Because of "the infractions," Rhodes made the decision to terminate Plaintiff's HCPD employment effective immediately. She reminded Plaintiff his termination was subject to grievance procedures outlined in the personnel manual and directed questions to Horry County Human Resources Department. *Id.* Assistant County Administrator Paul Whitten signed the letter to indicate his approval; Plaintiff signed acknowledging receipt. *Id.* In deposition, Rhodes stated she made the decision to terminate Plaintiff. Rhodes Dep. 16, ECF No. 88-22. She had conversations with Donald and Rutherford and had incident reports of the December 2012 incident before her when making that decision. Rhodes Dep. 16-17.

A restraining order was put in place in magistrate's court after the events of December 3, 2012. Harmon Dep. 33. According to the terms of that restraining order, Plaintiff could have no contact with Harmon or her family, could not go to her job or "anything like that." Harmon Dep. 33. *See* Order, ECF No. 88-15 at 29-33.

Plaintiff initiated divorce proceedings against Harmon on January 24, 2013. ECF No. 88-17.

**e. Plaintiff's May 2013 Arrest**

On May 10, 2013, Harmon's friend took a photograph of Plaintiff outside Harmon's house. Harmon filed a police report, and a warrant was issued against Plaintiff. Harmon Dep. 33-34. Plaintiff was arrested for "Violation of Court Order of Protection" and detained at the J. Reuben Long Detention Center ("JRLDC") from May 13 through May 17, 2013. *See* ECF No. 88-15 at 34 (inmate release check-off sheet). Plaintiff states he remained on suicide watch[13] in a holding cell for those five days, was stripped of his clothes and given only a thin "sleeping bag type blanket." Pl.'s Aff. 15. He stated that he was required to sleep on a bench intended only for sitting and that he was never permitted to take a shower while there. *Id.*; *see also* Pl.'s Dep. 101-04.

Plaintiff appeared before Defendant Magistrate Arakas for his bond hearing and at the show-cause hearing regarding the violation of the Order of Protection. Arakas Dep. 6, ECF No. 88-20. Arakas testified in deposition that he had no specific recollection of the bond hearing; he recalled the show-cause hearing, but did not recall what documentation he had before him at that hearing. *Id.* at 5-7.

Online records of the Horry County Court of General Sessions indicate[14] Plaintiff pleaded guilty to the misconduct-in-office charge on May 16, 2013, and the CDV charges were "dismissed not indicted" by the Horry County Solicitor on May 17, 2013. *See*

---

[13] Plaintiff indicates he never claimed to be suicidal. *See* Pl.'s Dep. 106.

[14] The court may take judicial notice of matters of public record, including the public records regarding the Horry County Fifteenth Judicial Circuit Public Index. *See generally Int'l Ass'n of Machinists & Aerospace Workers v. Haley,* 832 F. Supp. 2d 612, 622 (D.S.C. 2011) ("The Court may take judicial notice of matters of public record . . . ."), *aff'd,* 482 F. App'x 759 (4th Cir.2012); *cf. Davis v. Richland Cnty.,* No. 4:12–CV–3429–RMG, 2013 WL 5797739, at *2 n.1 (D.S.C. Oct. 24, 2013) (taking judicial notice of a plaintiff's arrest records because they were available on the Richland County Fifth Judicial Circuit Public Index), *adopted by* 2013 WL 6068880 (D.S.C. Nov. 18, 2013).

http://publicindex.sccourts.org/Horry/PublicIndex/CaseDetails.aspx?County=26&CourtAgency=26001&Casenum=M975821&CaseType=C (last visited Dec. 2, 2015); http://publicindex.sccourts.org/Horry/PublicIndex/CaseDetails.aspx?County=26&CourtAgency=26001&Casenum=M975820&CaseType=C (last visited Dec. 2, 2015).

The charges for violating the court order were ended on July 23, 2013, and were "dismissed                                         not                                         indicted." http://publicindex.sccourts.org/Horry/PublicIndex/CaseDetails.aspx?County=26&CourtAgency=26001&Casenum=2013A2610200924&CaseType=C (last visited Dec. 2, 2015).

IV.    Analysis

A.    Judicial immunity as to claims against Defendant Arakas

Plaintiff named Horry County Magistrate Arakas as a Defendant in his § 1983 claim and in his claim for intentional infliction of emotional distress (brought against "all Defendants"). Defendants argue Judge Arakas should be dismissed pursuant to the doctrine of judicial immunity. Defs.' Mem. 18-19. The undersigned agrees.

A judicial officer in the performance of his or her duties has absolute immunity from suit. *Mireles v. Waco,* 502 U.S. 9, 12 (1991). The doctrine of absolute immunity for acts taken by a judge in connection with his or her judicial authority and responsibility is well established and widely recognized. *See Mireles v. Waco,* 502 U.S. 9, 11-12 (1991) (judges are immune from civil suit for actions taken in their judicial capacity, unless "taken in the complete absence of all jurisdiction."); *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (absolute immunity "is an immunity from suit rather than a mere defense to liability"); *Stump v. Sparkman,* 435 U.S. 349, 359 (1978) ("A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors.").

15

There are two circumstances under which a judge's immunity from civil liability may be overcome. The exceptions are narrow in scope and infrequently applied. The first exception—when a judge engages in nonjudicial acts, *i.e.,* actions not taken in the judge's judicial capacity. *id.; see Figueroa,* 208 F.3d at 440—is not at issue here.

Plaintiff submits Arakas' actions fall within the second exception to absolute immunity—when a judge's actions, though judicial in nature, are taken in the complete absence of jurisdiction. *Mireles,* 502 U.S. at 12. *See* Pl.'s Mem. 34-36. Although not a model of clarity, Plaintiff's argument seems to be that Arakas was without jurisdiction to sign an arrest warrant against Plaintiff for his violating the order of protection as Magistrate Arakas lacked jurisdiction to enforce a family court order of protection. *See id.*; *see also* Pl.'s Mem. 12-13 (citing to Arakas Dep. 8-10, 14, 16, 17, in which Arakas notes that "protective orders from Family Court are only enforced in Family Court" and that he "signed the arrest warrant based on the representations of the officer not on any information during a hearing."). Plaintiff sets out a portion of the South Carolina Court of Appeals' opinion in *O'Laughlin v. Windham*, 498 S.E.2d 689 (S.C. Ct. App. 1998), in support of his argument. *See* Pl.'s Mem. 34-35. Plaintiff's citation to *O'Laughlin* is unconvincing. In *O'Laughlin*, the court did not reach the question of whether the judicial-officer defendant was entitled to common-law judicial immunity because the issue had not been preserved for appeal. *See* 498 S.E.2d at 693. The court did note, however, that "[t]he weight of authority favors the extension of common law judicial immunity to the judicial acts of all judicial officers, including those with limited jurisdiction. *Id.* Here, Plaintiff does not argue that the signing of an arrest warrant was a "nonjudicial act," nor could that be argued with any force. Further, as the United States Supreme Court has noted, "the scope of the judge's jurisdiction

16

must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

In *King v. Myers,* 973 F.2d 354 (4th Cir. 1992), the Fourth Circuit looked to the nature of the function performed, pursuant to *Forrester v. White,* 484 U.S. 219, 227-29 (1988), in determining that judicial immunity barred a lawsuit against a magistrate who ordered the arrest of the plaintiff without a warrant. The court found

> [the magistrate's] actions were judicial in that, while she may have exceeded her authority in the manner in which she ordered the arrest, she performed a function 'normally performed by a judge.' *Stump v. Sparkman,* 435 U.S. at 362. Therefore, the district court properly determined that [the magistrate] was entitled to judicial immunity.

*King,* 973 F.3d at 356-58 (4th Cir. 1992).

Here, Arakas signed an arrest warrant for Plaintiff that was sought by HCPD Officer Ruggerio. *See* ECF NO. 77-6. The warrant indicated an offense based on S.C. Code Ann. § 16-25-20(D). *See id.* An offense pursuant to that subsection "may be tried in summary court." S.C. Code Ann. § 16-25-20(D)(1).[15]

The undersigned is of the opinion that Arakas is entitled to judicial immunity and should be dismissed from this litigation.[16]

---

[15] South Carolina's magistrate courts and municipal courts are known as summary courts. S.C.Code Ann. § 22–3–730 (2007) ("All proceedings before magistrates shall be summary . . ."); *see State v. Long*, 753 S.E.2d 425, 427 (S.C. 2014).

[16] Additionally, although not specifically referenced by the parties in their briefs, the court notes paperwork from Plaintiff's detention indicated the arrest for violating an order of protection was a charge made pursuant to S.C. Code Ann. § 16-3-1800 (entitled "Arrest upon violation of restraining order"). *See* ECF No. 88-15 at 81. That statute provides that law enforcement officers "shall arrest a defendant who is acting in violation of a restraining order after service and notice of the order is provided[]" and indicates "[a]n arrest warrant is not required." *Id.*

### B.  Section 1983 Claims

Plaintiff brings his first cause of action under 42 U.S.C. § 1983 against HCPD, Rhodes, Harrelson, Rutherford, Arakas, Thompson, and HCSD. He avers these Defendants "acted, instituted, and pursued false charges" against him, violating his constitutional rights to "Free Association, First Amendment rights, Fourth Amendment Rights, Garrity and Miranda Rights." Am. Compl. ¶¶ 84-92.[17] This action is filed pursuant to 42 U.S.C. § 1983, which provides a private cause of action for constitutional violations by persons acting under color of state law. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979)). Accordingly, a civil action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 707 (1999).

### a.  Section 1983 Claim: which Defendants?

In his Amended Complaint, Plaintiff's § 1983 allegations name HCPD, Rhodes, Harrelson, Rutherford, Arakas, Thompson, and HCSD. Am. Compl. ¶¶ 84-92. In responding to summary judgment, though, Plaintiff concedes the § 1983 claims may not be brought against HCPD or HCSD. Pl.'s Mem. 39 ("The 42 U.S.C. § 1983 action is only being pursued against the individually named Defendant's (sic) as is the law."). Accordingly, HCPD and HCSD should be dismissed from this cause of action. As discussed above, Defendant Arakas should be dismissed based on judicial immunity.

---

[17] In discussing his § 1983 claims, Plaintiff focuses only on his Fourth Amendment rights, which he alleges were violated as a result of his arrests. *See* Pl.'s Mem. 32-33.

The court then considers Plaintiff's § 1983 claim as to individual Defendants Rhodes, Harrelson, Rutherford, and Thompson.[18] In order to state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege that a person acting under color of state law deprived him or her of a constitutional right or of a right conferred by a law of the United States. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998). A plaintiff must affirmatively state facts indicating that a defendant acted personally in the deprivation of his constitutional rights. *See Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own actions, has violated the Constitution."). As a general rule, the doctrine of vicarious liability or respondeat superior is not available to a § 1983 plaintiff as a means to create liability of a state-actor supervisor for the acts or his/her subordinate. *See Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978).

      b.  Impact of Plaintiff's guilty plea

Defendants argue several of Plaintiff's causes of action are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), because they call into question his state court conviction stemming from the December 2012 arrest. *See*, *e.g.*, Defs.' Mem. 9. In particular, Defendants submit *Heck* bars Plaintiff's claims for intentional interference with contract, wrongful termination, abuse of process, malicious prosecution, and false arrest,[19] to the extent the claims call into question his state-court conviction and sentence, which were effected by Plaintiff's guilty plea. *See* Defs.' Mem. 9-10, 14-15. Plaintiff never specifically addresses Defendants' argument regarding the

---

[18] Harmon is not listed as a defendant to the § 1983 claims, nor could she be as she could not be considered to have acted "under color of state law."

[19] As Defendants note, Plaintiff's Amended Complaint does not include separate causes of action for malicious prosecution or false arrest. Rather, his § 1983 cause of action raises constitutional-based claims of malicious prosecution. *See* Am. Compl. ¶ 89.

potential *Heck* bar other than arguing Plaintiff never pleaded guilty to misconduct in office. Pl.'s

Mem. 19-20.[20]

In *Heck*, the Court stated:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm whose unlawfulness would render a conviction or sentence invalid, . . . a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Heck*, 512 U.S. at 486-87. This requirement, which is the crux of Defendants' argument, is often

referred to as the "favorable disposition" requirement.

In addition, although not specifically discussed by either party, the *Heck* bar applies only

to those in custody or to those who had sufficient time to pursue habeas corpus relief while they

were incarcerated. *Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 197 n.10 (4th Cir. 2015)

(noting the *Heck* bar applies only to § 1983 claims from state prisoners who are in custody or

---

[20] Indeed, Plaintiff provides very little argument against Defendants' *Heck*-bar arguments other than to explain that he pleaded guilty to a misdemeanor charge of "Public official, misconduct in office," rather than the "Misconduct in office, malfeasance, misfeasance, or nonfeasance" and CDV charges. *E.g.*, Pl.'s Mem. 20. As detailed within, the undersigned recommends finding that *Heck* does not bar Plaintiff's claims. In any event, if *Heck* were an appropriate part of this analysis, it is noted that a charge's dismissal as a part of a plea agreement concerning a related claim does not circumvent *Heck's* "favorable termination requirement." *See Etcheber v. F.B.I.*, No. CA 2:13-0752-JFA-BM, 2014 WL 1319145 (D.S.C. Mar. 28, 2014) *aff'd*, 583 F. App'x 271 (4th Cir. 2014) (noting dismissal of charge as part of a plea agreement does not satisfy *Heck's* "favorable termination" requirement).

who are no longer in custody but had sufficient time to pursue habeas remedies). This is so because:

> If a prisoner could not, as a practical matter, seek habeas relief, and after release, was prevented from filing a § 1983 claim, § 1983's purpose of providing litigants with "a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nations," [*Wilson v. Garcia*, 471 U.S. 261,] 271–272 [(1985) (overruled on other grounds)] (internal quotation marks and citation omitted), would be severely imperiled. Barring Wilson's claim would leave him without access to any judicial forum in which to seek relief for his alleged wrongful imprisonment. Quite simply, we do not believe that a habeas ineligible former prisoner seeking redress for denial of his most precious right—freedom—should be left without access to a federal court.

*Wilson v. Johnson*, 535 F.3d 262, 268 (4th Cir. 2008). The Fourth Circuit recently noted that "[t]ogether, *Covey* and *Wilson* delineate the *Heck* bar's narrow exception. A would-be plaintiff who is no longer in custody may bring a § 1983 claim undermining the validity of a prior conviction only if he lacked access to federal habeas corpus while in custody." *Griffin v. Baltimore Police Dep't*, No. 14-1494, 2015 WL 6467885, at *4 (4th Cir. Oct. 27, 2015). *Cf. Wells v. Sterling*, No. 6:15-1344-MBS-KFM, 2015 WL 2401859, at *2 (D.S.C. May 20, 2015) (citing *Wilson* and declining to apply *Heck* to summarily dismiss pro se plaintiff's § 1983 claim seeking monetary compensation for wrongful imprisonment when to do so would deprive a "habeas ineligible former prisoner [of the opportunity] to seek redress for the alleged denial of his freedom.").

Here, Plaintiff was released on bond shortly after his December 3, 2012 arrest and, upon pleading guilty to a charge of "Public official, misconduct in office," on May 16, 2013, he received a one-year sentence "suspended to a $500 fine plus court costs." http://publicindex.sccourts.org/Horry/PublicIndex/CaseDetails.aspx?County=26&CourtAgency=26001&Casenum=M975821&CaseType=C (last visited Dec. 2, 2015). Horry County's Public Index records indicate Plaintiff paid $1167.50 for "fine and costs" on May 16, 2013.

http://publicindex.sccourts.org/Horry/PublicIndex/CaseDetails.aspx?County=26&CourtAgency=
26001&Casenum=M975821&CaseType=C (last visited on Dec. 2, 2015). This makes it unlikely
that Plaintiff possibly was detained for a sufficient time to challenge his sentence pursuant to
state post-conviction-relief procedures or federal habeas procedures. Accordingly, to foreclose
Plaintiff's claim seeking redress of alleged constitutional violations could leave Plaintiff
"without access to any judicial forum in which to seek relief for his alleged" constitutional
claims. *Wilson*, 535 F.3d at 268.

Based on the record and arguments presented, the undersigned cannot determine the *Heck*
bar appropriately could be applied to any of Plaintiff's claims. *Cf. Covey*, 777 F.3d at 198
(remanding for consideration of whether *Heck* applied to plaintiff no longer in custody).
Accordingly, it is recommended Defendants' Motion for Summary Judgment on that ground be
denied, and the court further considers Plaintiff's § 1983 claims separately for the two
complained-of events.

1) Section 1983 claim related to Plaintiff's December 2012 arrest

Plaintiff's § 1983 claim, as elaborated and explained in Plaintiff's response to
Defendants' Motion, alleges Defendants violated his Fourth Amendment rights by "pursuing
false charges against the Plaintiff and falsely imprisoning the Plaintiff." *See* Pl.'s Mem. 32.
Plaintiff submits he was falsely arrested for CDV "in violation of the law" in December 2012
"when it was clear from the facts that" Harmon was the aggressor. *Id.* at 33.

Plaintiff submits he has "presented several genuine issues of material fact that would
allow the Plaintiff to proceed to a jury under any number of causes of action where the
Defendant violated the Plaintiff's constitutional, state and federally protected rights." Pl.'s Mem.
33. Plaintiff submits his December 2012 arrest for CDV violated his Fourth Amendment rights

"when it was clear from the facts that the Defendant [Harmon] was the aggressor." *Id.*; *see id.* at 10 (citing to Plaintiff's deposition testimony that Rutherford arrived on the scene, did not know what had transpired, and instructed that Plaintiff not Harmon, be arrested). Although Plaintiff does not elaborate on the argument, he submits that *Defendant HCPD* "lacked probable cause and justification." *Id.* at 33. As discussed above (and as Plaintiff concedes, *see* Pl.'s Mem. 39), HCPD is not a proper defendant to Plaintiff's § 1983-based claims. Accordingly, based on Plaintiff's own argument and characterization of his § 1983 claim, summary judgment should be granted as to Plaintiff's claim that his December 2012 arrest violated his Fourth Amendment rights.

Here, although Plaintiff's Amended Complaint purports to pursue § 1983 claims against all individual Defendants except Harmon, the only individual Defendant even arguably involved in Plaintiff's December 2012 arrest was Defendant Rutherford.[21]

Any claims against other individuals—Rhodes, Harrelson, or Thompson—would need to proceed based on their supervisory relationship to Rutherford. Plaintiff correctly cites *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984), for the principle that a supervisory employee can be liable under § 1983 under certain limited circumstances. Pl.'s Mem. 32 n.130 (noting a supervisor could be responsible under § 1983 only if conduct of subordinates that "directly caused the deprivation was undertaken to effectuate an official policy or practice for which the official was responsible" or the supervisor "was aware of a pervasive, unreasonable risk of harm to Plaintiff from a specified source and failed to take corrective action himself, out of his own

---

[21] In his deposition, Plaintiff testified that Ridgeway charged him with CDV after consulting with both Rutherford and Harrelson. Pl.'s Dep. 10-11. However, Plaintiff never provides any additional information or argument of Harrelson's personal involvement in the decision to charge Plaintiff on December 3, 2012. *See also* Am. Compl. ¶¶ 63, 64 (indicating only Rutherford was involved). In any event, Plaintiff's unsupported deposition testimony that Harrelson may have consulted with Ridgeway that evening is insufficient to survive summary judgment as to him.

deliberate indifference or his tacit authorization of inaction by subordinates"). However, neither Plaintiff's Amended Complaint nor his response to Defendants' Motion attributes any actions of Defendants Rhodes,[22] Harrelson, or Thompson to the December 2012 arrest. Further, Plaintiff has set forth no allegations that the claimed wrongs were the result of the effectuating of any official policy or practice of HCPD or HCSD. Accordingly, any § 1983 claim relating to the December 2012 arrest should be dismissed as to all Defendants other than Rutherford.

In considering any Fourth Amendment claim against Rutherford, as noted by Defendants, Plaintiff has acknowledged that only Officer Ridgeway was involved in the decision to charge Plaintiff with CDV. Defs.' Mem. 21, *see id* at 8 (citing Plaintiff's deposition testimony that "discretion of who to arrest in a domestic violence situation rests with the investigative officer" (here, Ridgeway)). Further, Plaintiff conceded in deposition that he "probably should have been charged with" misconduct in office in December 2012. Pl.'s Dep. 7. It is undisputed that Ridgeway, not Rutherford,[23] effected Plaintiff's arrest. Summary judgment is appropriate as to all Defendants for Plaintiff's Fourth-Amendment-based § 1983 claim related to the December 2012 arrest.

2) Section 1983 Claims Concerning the May 2013 Arrest

Plaintiff also seeks to recover pursuant to § 1983 based on his May 2013 arrest for violation of a protective order and his detention immediately following that arrest. *See* Am. Compl. ¶¶ 72-92. Plaintiff submits this arrest was for "violation of a Family Court order that was

---

[22] Plaintiff references Rhodes, Chief of HCPD, as terminating him from his HCPD employment after being informed of the December 2, 2012 incident by Defendant Rutherford and Officer Donald. Pl.'s Mem. 10 (citing to excerpts of depositions of Plaintiff and Rhodes). While Plaintiff certainly challenges his termination, he does not argue that the termination was itself a Fourth-Amendment violation, nor does he analyze the actions as violative of other constitutional rights.
[23] Plaintiff's state-law-based claim for abuse of process against Rutherford, which relates to his alleged involvement in the December 2012 arrest, *see* Pl.'s Mem. 25, is discussed below.

24

not enforceable by the Summary Court judge and should have been enforced by the Family Court." Pl.'s Mem. 33. He continues that "Defendant [HCPD] took it upon themselves to enforce a court order when there had not actually been a violation because [Defendant Harmon] was not even in the home. The actions of the Defendants rise to a level of triggering 42 U.S.C. 1983." Pl.'s Mem. 33. Without further detail, Plaintiff argues he was arrested "in violation of the law" and that HCPD "lacked probable cause and justification." *Id.*

The charges for violating the court order were ended on July 23, 2013, and were "dismissed                             not                             indicted." http://publicindex.sccourts.org/Horry/PublicIndex/CaseDetails.aspx?County=26&CourtAgency= 26001&Casenum=2013A2610200924&CaseType=C (last visited Dec. 2, 2015).[24] Accordingly, Defendants couch the issue as being whether probable cause existed to arrest Plaintiff in May 2013. Defs.' Mem. 16.

Although not raised by Defendants, the court notes that Plaintiff cannot pursue a § 1983 claim against "HCPD" for arresting him without probable cause. Rather, as discussed above, and as conceded by Plaintiff in his memorandum, § 1983 claims can be pursued only against individually named Defendants. Pl.'s Mem. 39. In discussing this claim in his Amended Complaint, Plaintiff focuses on Defendant Harmon's having "provided information to the police" in order to have Plaintiff arrested a second time. Am. Compl. ¶ 72. Plaintiff has raised no claim against any named individual Defendant associated with the HCPD as to the May 2013 arrest. To the extent Plaintiff's constitutional allegations concerning the May 2013 arrest stem from Defendant Arakas' conduct or his supposed lack of jurisdiction, the allegations are without merit

---

[24] In discussing Plaintiff's claims arising out of the May 2013 arrest for violating a protective order, Defendants assume, but do not concede, it is appropriate to consider the merits of Plaintiff's malicious prosecution/false arrest claims. Defs.' Mem. 15.

as discussed above. Accordingly, it is recommended that summary judgment on Plaintiff's § 1983 cause of action be granted as to events concerning the May 2013 arrest, and the court need not reach the issue of whether there was probable cause to support the May 2013 arrest.

Potentially concerning an Eighth Amendment violation, Plaintiff also avers Defendants Thompson and HCSD failed to provide Plaintiff with adequate care while he was incarcerated. Am. Compl. ¶¶ 75-78. As an initial matter, the Eleventh Amendment bars suits by citizens against non-consenting states brought either in state or federal court. *See Alden v. Maine,* 527 U.S. 706, 712–13 (1999). Such immunity extends to arms of the state, *see Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 101–02 (1984), and bars this court from granting injunctive relief against the state or its agencies. *See Ala. v. Pugh,* 438 U.S. 781 (1978). Sheriffs' departments in South Carolina are considered state agencies. *See Carroll v. Greenville Cnty. Sheriff's Dep't,* 871 F. Supp. 844, 846 (D.S.C. 1994) ("It is well established in this state that a sheriff's office is an agency of, and a sheriff 'dominated by,' the state, such that a suit against the sheriff in his official capacity is a suit against the State."); *see also Wirtz v. Oconee Cnty. Sheriff's Dep't,* No. 8:13–1041–RMG, 2013 WL 5372795, at *1 (D.S.C. Sept. 24, 2013) ("Under South Carolina law, a sheriff's department is a state agency, not a department under the control of the county."). Accordingly, HCSD is exempt from § 1983 liability and should be dismissed from this action.

Plaintiff has not named any individual associated with the HCSD who allegedly was involved in his treatment at the detention center. He concedes, however, that he has no allegation against Defendant Sheriff Thompson other than that he oversees the detention facility. *See* Pl.'s Dep. 123. In responding to Defendants' Motion on that point, Plaintiff notes that he merely named Thompson because "in a 1983 action the individual has to be named." Pl.'s Mem. 36.

This argument misses the point, however. As detailed above, to establish § 1983 liability, a plaintiff must set forth specific allegations of constitutional-level misconduct by an individual Defendant. Absent that, to demonstrate an individual such as Sheriff Thompson could be liable for actions merely because he is the Sheriff and in charge of the detention center, a § 1983 plaintiff must demonstrate much more.

Further, Sheriff Thompson could be responsible only if the supervisory official was (1) actually or constructively aware that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury, (2) deliberately indifferent to that risk, and (3) that an affirmative causal link exists between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 798-99 (4th Cir. 1994). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions." *Id*. at 799 (citing *Slakan*, 737 F.2d at 373-74). "Ordinarily [a plaintiff] cannot satisfy this burden of proof by pointing to a single incident or isolated incidents." *Slakan*, 737 F.2d at 373.

Plaintiff has raised no supportable § 1983 constitutional violation based on his May 2013 arrest, making summary judgment appropriate as to that portion of the § 1983 claim. Accordingly, the court need not consider Defendants' argument that they are entitled to qualified immunity for this portion of Plaintiff's claim.

C.  Intentional Interference with a Contract (Harrelson and Rutherford)

Plaintiff's Amended Complaint includes a claim of intentional interference with contract against Defendants Harrelson and Rutherford, whom he claims "intentionally made false statements" regarding Plaintiff's integrity to "procure the constructive discharge of the Plaintiff from his employment" and to ruin his reputation as a police officer. Am. Compl. ¶¶ 93-101. To

27

establish a viable cause of action for wrongful interference with an existing contractual relationship, Plaintiff must establish the following elements: (1) a contract; (2) knowledge of the contract by Defendants; (3) an intentional procurement of the contract's breach; (4) the absence of justification for the breach; and (5) resulting damages. *See Love v. Gamble*, 448 S.E.2d 876, 882 (S.C. Ct. App. 1994).

Defendants Harrelson and Rutherford seek summary judgment as to this case of action "[t]o the extent [Plaintiff's] complaints against his supervisors attempts to call into question his state court conviction[.]" Defs.' Mem. 9 (citing *Heck*). As noted by Plaintiff, *see* Pl.'s Mem. 20, Defendants do not provide any other argument regarding the potential merits of this cause of action. As discussed above, the undersigned is of the opinion that *Heck* is not appropriate to the analysis of Plaintiff's claims. On this record, Defendants' Motion for Summary Judgment as to Plaintiff's claim for intentional interference with a contract should be denied.[25]

D. Wrongful Termination in Violation of Public Policy (HCPD)

Plaintiff sued HCPD for wrongful termination in violation of public policy. Am. Compl. ¶¶ 102-09. In very limited circumstances, South Carolina recognizes a "public policy exception" to the doctrine of at-will employment. *See Barron v. Labor Finders of S.C.,* 713 S.E.2d 634, 636 (S.C. 2011). As the South Carolina Court of Appeals has explained:

> When there has been a "retaliatory termination of the at-will employee in violation of a clear mandate of public policy" the employee may have a tort cause of action for wrongful termination. 713 S.E.2d at 637. "The primary source of the declaration of the public policy of the state is the General Assembly; the courts assume this prerogative only in the absence of legislative declaration." *Citizens' Bank v. Heyward,* 135 S.C. 190, 133 S.E. 709, 713 (1925); *see Barron,* 393 S.C.

---

[25] By making this recommendation, the undersigned offers no opinion as to Plaintiff's argument that, although an "at-will employee," he had a "contract of employment sufficient to satisfy the "contract" element of this cause of action. *See* Pl.'s Mem. 20. The court further notes that Plaintiff's argument that Rutherford and Harrelson are "not entitled to qualified immunity," *id.* at 21, concerning this state-law-based cause of action is misplaced.

at 617, 713 S.E.2d at 638 (stating the determination of what constitutes public policy for purposes of the public policy exception to the at-will employment doctrine is a question of law for the courts to decide). "The public policy exception clearly applies in cases where either (1) the employer requires the employee to violate the law, or (2) the reason for the employee's termination itself is a violation of criminal law." *Barron,* 393 S.C. at 614, 713 S.E.2d at 637; *see Ludwick v. This Minute of Carolina, Inc.,* 287 S.C. 219, 225, 337 S.E.2d 213, 216 (1985) (holding the public policy exception is invoked when an employer requires an at-will employee, as a condition of retaining employment, to violate the law); *Culler v. Blue Ridge Elec. Co-op., Inc.,* 309 S.C. 243, 246, 422 S.E.2d 91, 93 (1992) (finding employee would have a cause of action for wrongful discharge if he was discharged because he refused to contribute to a political action fund). The *Barron* court found the public policy exception is not limited to these two situations; however, the exception has not yet been extended beyond them. 393 S.C. at 614, 713 S.E.2d at 637.

*McNeil v. S.C. Dep't of Corr.*, 743 S.E.2d 843, 846 (S.C. Ct. App. 2013), *reh'g denied* (June 25, 2013).

Here, Defendant HCPD moves for summary judgment, again arguing the claim is a challenge to "the facts underlying his state court conviction" and should be dismissed pursuant to *Heck*. Defs.' Mem. 9. In response, Plaintiff notes HCPD did not examine the elements of the cause of action and argues this portion of the Motion should be denied. Pl.'s Mem. 22.

As noted above, the undersigned is of the opinion that *Heck* does not bar all of Plaintiff's claims in this case. Because Defendant fails to make any substantive argument as to this cause of action, the undersigned recommends summary judgment be *denied*. In so recommending, however, the court notes the difficulty of any plaintiff establishing the "public policy" prong of this cause of action. In January 2015, the South Carolina Supreme Court reiterated the "restraint" employed by the courts in "undertaking the amorphous inquiry of what constitutes public policy." *Taghivand v. Rite Aid Corp.*, 768 S.E.2d 385, 389 (S.C. 2015) (noting any exception to the at-will employment doctrine "should emanate from the General Assembly, and from [the Supreme Court of South Carolina] only when the legislature has not spoken").

E.  Abuse of Process (Rutherford)

Plaintiff also brings a state-law-based[26] cause of action against Rutherford for abuse of process. Am. Compl. ¶¶ 110-16, *see also* Pl.'s Mem. 24-25. Under South Carolina law, "[t]he essential elements of abuse of process are: (1) an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Johnson v. Painter,* 307 S.E.2d 860, 860 (S.C. 1983); *Hainer v. Am. Med. Int'l, Inc.,* 492 S.E.2d 103, 107 (S.C. 1997) ("There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions."). Usually, the improper purpose is "coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or club." *Huggins v. Winn–Dixie Greenville, Inc.,* 153 S.E.2d 693, 694 (S.C. 1967) (citation omitted).

Defendant argues the abuse-of-process claim relating to the December 2012 arrest is foreclosed by *Heck*. As to the May 2013 arrest, Rutherford argues Plaintiff has "failed to allege or offer any evidence of an ulterior motive." Defs.' Mem. 10. As noted above, the *Heck* bar is inapplicable here, making summary judgment inappropriate as to the December 2012 arrest. Regarding the May 2013 arrest, though, Plaintiff has not set forth any facts to support any "willful acts" and "ulterior purpose" on the part of Rutherford in connection with that arrest. At this juncture, summary judgment is appropriate only as to the abuse-of-process claim for the May 2013 arrest.

F.  Intentional Infliction of Emotional Distress (all Defendants)

Plaintiff asserts a cause of action against all Defendants for intentional infliction of emotion distress, or "outrage." Pl.'s Am. Compl. ¶¶ 117-22. In his Complaint, Plaintiff alleges

---

[26] Plaintiff does not plead or argue a constitutional violation as part of the abuse-of-process claim.

Defendants' "behavior was absurd, intentional, reckless and inflicted severe emotional distress," and that the actions were "calculated to emotionally harm the Plaintiff[,]" "by their illegal actions of reporting false information regarding the Plaintiff, slandering the Plaintiff and bringing about the Plaintiff's termination of employment." *Id.* ¶¶ 118-19, 122. Defendants seek summary judgment, alleging the conduct complained of by Plaintiff, even when viewed in the light most favorable to him, does not rise to the level necessary to constitute outrage for purposes of his intentional-infliction-of-emotional-distress claim. The undersigned agrees.

To maintain a claim for intentional infliction of emotional distress or outrage, Plaintiff must establish the following:

(1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct;

(2) the conduct was so extreme and outrageous so as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community;

(3) the actions of the defendant caused plaintiff's emotional distress; and

(4) the emotional distress suffered by plaintiff was so severe that no reasonable man could be expected to endure it.

*Hansson v. Scalise Builders of S.C.,* 650 S.E.2d 68, 70 (S.C. 2007) (internal citations and quotations omitted). As explained by the South Carolina Supreme Court in *Hannson*, "the court plays a significant gatekeeping role in analyzing a defendant's motion for summary judgment[]" in order to prevent claims for intentional infliction of emotional distress from becoming a panacea for wounded feelings rather than reprehensible conduct[.]" 650 S.E. 2d at 72 (internal quotations and citations omitted). The *Hannson* court noted that a plaintiff alleging an emotional distress claim bears a "heightened standard of proof." *Id.*

In the employment context, mere termination or unpleasant conduct by supervisors does not rise to the level of actionable outrage. *See, e.g.*, *Alonso v. McAllister Towing of Charleston,*

*Inc.* 595 F. Supp. 2d 645, 649-50 (D.S.C. 2009) (dismissing as a matter of law plaintiff's claim for intentional infliction of emotional distress because of termination and noting "having one's employment terminated is a stressful experience, but it can hardly be said to be an act so severe that no reasonable person could be expected to endure it.") (internal quotation omitted); *Shipman v. Glenn*, 443 S.E.2d 921, 922–23 (S.C. Ct. App. 1994) (holding supervisor's actions of verbally abusing and threatening an employee with cerebral palsy with the loss of her job, and ridiculing the employee's speech impediment to the extent the employee was physically ill and had to leave work early was insufficient to state a claim for outrage); *Wright v. Sparrow*, 381 S.E.2d 503, 505-06 (S.C. Ct. App. 1989) (finding allegations that supervisor built a case to justify firing the plaintiff by loading her with responsibility while stripping her of authority and by changing the manner of performing certain duties and then accusing her of not following directions insufficient as a matter of law to constitute the tort of outrage); *Corder v. Champion Rd. Mach. Int'l Co.*, 324 S.E.2d 79, 81 (S.C. 1984) (holding plaintiffs' allegation they were fired in retaliation for exercising their legal rights was insufficient as a matter of law to constitute outrage).

In response to Defendants' Motion, Plaintiff submits that Defendants focused only on the argument that an outrage claim will not lie for "a mere termination." Pl.'s Mem. 25. Instead, Plaintiff submits Defendants did not address the treatment of Plaintiff at the December 2012 arrest and the treatment during and after the May 2013 arrest. *Id.* He adds that this cause of action is about the way Defendants treated him "during his employment after complaining about Jack Stewart, the Defendant[s'] disregard for the Plaintiff's constitutional rights and the blatant disregard for the law." *Id.* at 25-26. Noting the court's role in considering the "very subjective elements," Plaintiff points to "[t]he work environment created by the Defendants as is evidenced

by the testimony provided by the Plaintiff [that was] was extreme and outrageous." *Id.* at 26-27. Plaintiff notes the situation must be examined "as a whole and not singularly." *Id.* at 27.

Having considered the facts and allegations in the light most favorable to Plaintiff, but performing the role of gatekeeper as to Plaintiff's cause of action for intentional infliction of emotional distress, the court finds Plaintiff has not met his burden of establishing a prima facie case of conduct that rises to the level of outrage under South Carolina law. *See Hannson*, 650 S.E. 2d at 72; *see also Johnson v. Dailey*, 437 S.E.2d 613, 615 (S.C. 1995) (noting the court determines, as a matter of law, whether a plaintiff's complained-of conduct was "so extreme and outrageous it exceed[ed] all possible bounds of decency, and [was] regarded as atrocious and utterly intolerable in a civilized society.") (internal citations omitted).

Here, the court is unpersuaded that Plaintiff has demonstrated the general "way he was treated" after making reports rises to the level of actionable outrage. At worst, Plaintiff indicates he was treated unfairly and that his supervisor was "out to get him." This treatment, which arguably involved Plaintiff's being removed from motorcycle duty and being required to take shifts he did not want, is not so "unnecessarily harsh" that a jury could find it to exceed all possible bounds of decency. *See e.g.*, *Wright*, 381 S.E.2d at 505-06 (finding allegations that supervisor built a case to justify firing the plaintiff insufficient as a matter of law to constitute the tort of outrage); *Moore v. Rural Health Servs., Inc.*, 1:04-376-RBH, 2007 WL 666796, at *17 (D.S.C. Feb. 27, 2007) (finding no outrage claim when plaintiff was accused of being a racist by employer's board members, was threatened with termination and escorted from his workplace by a sheriff's deputy while a board member yelled down the hallway that the plaintiff was a thief "is not sufficient (even assumed to be true for purposes of summary judgment) to meet the high standard for establishing Plaintiff's outrage claim under South Carolina law."); *Gattison v. S.C.*

*St. Coll.*, 456 S.E.2d 414, 418-19 (S.C. Ct. App. 1995) (finding internal auditor who faced a hostile environment that destroyed his career after he made numerous internal and external reports of irregularities resulting in an investigation by the Commission on Higher Education proved only "unprofessional, inappropriate behavior" but "f[e]ll short of [showing] conduct that exceeds all possible bounds of decency and is atrocious and utterly intolerable in a civilized society").*cf. DeCecco v. Univ. of S. Carolina*, 918 F. Supp. 2d 471, 520 (D.S.C. 2013) (finding interaction between player and coaches insufficient to state claim of outrage).[27]

Further, after careful consideration of all evidence submitted, and based on the heightened standard of scrutiny the court is to employ in considering outrage causes of action at this stage, the undersigned is of the opinion that Rutherford's alleged actions surrounding Plaintiff's December 2012 arrest—even if accurate—do not rise to the level of conduct from which a jury could find for Plaintiff as to the cause of action for intentional infliction of emotional distress. *See Champion Road Mach.*, 324 S.E.2d at 81 (citing *Hudson v. Zenith Engraving Co., Inc.*, 259 S.E.2d 812, 814 (S.C. 1979) (noting that in South Carolina, a plaintiff can succeed on a claim for intentional infliction of emotional distress only "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."). Assuming, *arguendo*, that Ridgeway initially planned to arrest Harmon, not Plaintiff, for CDV on December 2012, review of her arrest report indicates additional facts concerning acts of earlier that same evening. Upon learning those facts (presumably from Rutherford), charging Plaintiff is not so "outrageous" so as to exceed all bounds of decency. *Cf.*

---

[27] The court further notes that the exclusivity provision of the South Carolina Workers' Compensation Act, S.C. Code Ann. § 42-1-540, may bar at least portions of Plaintiff's outrage claim.

*Cosby v. Legal Servs. Corp.*, No. CIV.A. 6:05-131-GRA, 2006 WL 4781412, at *6 (D.S.C. May 11, 2006) *aff'd sub nom. Cosby v. Legal Servs. Corp.*, 227 F. App'x 279 (4th Cir. 2007) (citing *Folkens v. Hunt,* 290 S.C. 194, 348 S.E.2d 839 (S.C.App.1986) for proposition that "falsely accusing someone of criminal conduct does not amount to the tort of outrage.").

Similarly unavailing is Plaintiff's general argument that his "treatment during the December 2012 arrest and May 2013 arrest [make it] clear on its face that the Defendants were out to harm the Plaintiff." Pl.'s Mem. 27. Defendants' Motion for Summary Judgment should be granted as to the outrage cause of action.

### G. Conversion (seemingly against HCPD)

Plaintiff also brings a conversion cause of action, apparently against HCPD for refusing to return certain accessories Plaintiff had installed on an HCPD-owned motorcycle during his employment with HCPD. Am. Compl. ¶¶ 123-28. Defendants argue that, to the extent Plaintiff is complaining of a negligent act based on the failure to return property, such a claim is not actionable as a § 1983-based claim for a due process violation. Defs.' Mem. 12. As noted by Defendants, the Due Process Clause is not implicated by a negligent act of a governmental official causing unintended loss of or injury to life, liberty, or property. *Daniels v. Williams,* 474 U.S. 327 (1986); *Pink v. Lester,* 52 F.3d 73, 75 (4th Cir. 1995). Thus, to the extent Plaintiff complains of negligent conduct by HCPD, he cannot bring this action under § 1983. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 200–03 (1989) ("[t]he Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation").

In response, Plaintiff does not acknowledge the case law cited by Defendants, nor does he argue he has raised a viable § 1983 claim for conversion. Rather, Plaintiff cites to Defendant

Rutherford's testimony that certain equipment had not been returned because it would make the HCPD-owned motorcycle inoperable. Pl.'s Mem. 28 (citing Rutherford Dep. 14, 16). He argues that Rutherford's testimony makes it clear that he was damaged by HCPD's failure to return those items. *Id.*

The undersigned agrees with Defendants that Plaintiff has not set out a conversion violation actionable pursuant to § 1983 and recommends summary judgment be granted as to such a claim. This recommendation does not offer any ruling concerning whether another type of conversion claim based on state law could proceed.

H.  Retaliation in violation of 42 U.S.C. § 1981[28]

In his Amended Complaint, Plaintiff seeks relief pursuant to § 1981, claiming he was retaliated against for reporting "racist remarks within his precinct" and that "Defendant took adverse employment action against the Plaintiff" because he had reported those remarks. Am. Compl. ¶¶ 148-54. Inexplicably, given Plaintiff's § 1981 allegations concerning retaliation in the employment context, Defendants seek summary judgment as to Plaintiff's § 1981 retaliation claim based on a claim that "his retaliation occurred while at the Horry Detention Center." Defs.' Mem. 13; *see also id.* at 12-14.

In responding to Defendants' Motion, Plaintiff points out that the retaliation claim concerns his termination that was allegedly based on his "complaints regarding discrimination," and notes Defendants' Motion did not brief those allegations. Pl.'s Mem. 31. Although Defendants filed a Reply, they do not address the retaliation claim in that memorandum.

---

[28] Neither Plaintiff's Complaint nor his response to summary judgment makes it clear against which Defendant(s) he brings his § 1981 claim. However, because Plaintiff does make it clear that his § 1981 claims relate to his employment with HCPD, it is recommended that Defendants HCSD and Sheriff Thompson be dismissed from this claim.

Accordingly, based on the record before the court, Defendants' summary judgment motion should be denied as to Plaintiff's claim for retaliation brought pursuant to 42 U.S.C. § 1981.

V.    Conclusion

For the reasons set forth above, the undersigned recommends Defendants' Motion for Summary Judgment be *granted in part and denied in part*, as follows:

- Defendant Arakas should be dismissed from the case on the basis of judicial immunity;

- summary judgment should be *granted* as to Plaintiff's Section 1983 Cause of Action;

- summary judgment should be *denied* as to the causes of action for intentional interference with contract (against Defendants Harrelson and Rutherford), wrongful termination in violation of public policy (against Defendant HCPD), abuse of process (against Defendant Rutherford and as to the December 2012 arrest only), and retaliation brought under 42 U.S.C. § 1981 (while unclear against which Defendants this cause of action is raised, it is recommended the § 1981 claim be dismissed as to Defendants HCSD and Thompson only at this juncture); and

- summary judgment should be granted as to a cause of action for conversion purported to be brought pursuant to 42 U.S.C. § 1983 only.

If the district court adopts this Recommendation, no claims will remain against Defendants Arakas, Thompson, or HCSD, and they should be dismissed from this suit.

The court notes that Defendant Harmon has not filed a dispositive motion as to the claims Plaintiff has raised against her. In addition, Defendants filed a counterclaim against Plaintiff seeking attorneys' fees and costs pursuant to 42 U.S.C. § 1988, ECF No. 48, to which Plaintiff responded with his own claim under South Carolina's Frivolous Proceedings Sanctions Act. ECF No. 49. Neither of these counterclaims is before the court at this time. Subsequent to the United

States District Judge's ruling on this Report and Recommendation, further scheduling information will be provided.

IT IS SO RECOMMENDED.

December 7, 2015                                    Kaymani D. West
Florence, South Carolina                           United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**